**VARGAS MANUFACTURING CO.**

v.

**Jay FRIEDMAN et al.**

No. 93–229–A.

Supreme Court of Rhode Island.

June 21, 1995.

Robert Fine, Licht & Semonoff, Providence, for plaintiff.

Christopher Fay, Fay & Fay, Cranston Kara Fay, Fay & Fay, Providence, for defendant.

OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of the plaintiff, Vargas Manufacturing Co. (Var-

gas), from a judgment entered in the Superior Court relieving the defendants, Jay Friedman (Friedman) and Gold Coast International Jewelry (GCI), of paying the balance due on a contract for the purchase of jewelry and awarding the defendants on their counterclaim a total of $40,000 in punitive damages. The plaintiff also appeals the denial of its motion for new trial with respect to the award of punitive damages. We affirm in part the judgment of the Superior Court and reverse the award of punitive damages. The appeal of the denial of the motion for new trial is rendered moot by our reversal of the award of punitive damages. The facts insofar as pertinent to this appeal are as follows.

Friedman, at all times relevant to this appeal, was an owner and officer of GCI, a wholesaler and manufacturer of costume jewelry. His company marketed and distributed jewelry through industry trade shows held throughout the country. In or around February 1986, GCI entered into a contract with Vargas to purchase various items of jewelry, primarily rings, which GCI would then resell to retailers and jobbers around the country.[1] From February 3, 1986, through March 7, 1986, GCI received a number of shipments of jewelry from Vargas pursuant to this contract for a total invoiced amount of $12,573.16. The payment terms of the contract are disputed by the parties.

During the period in question Vargas was represented by Wolff Associates, a manufacturers' representative. The terms of the contract between GCI and Vargas were negotiated by Wolff Associates, who according to Friedman, gave GCI a six-month open account to pay (meaning that payment was to be made within six months after receipt of the merchandise). Vargas's credit manager, however, testified that no such agreement had been made and that Vargas did not make agreements with such long payment terms.

Prior to contracting for the jewelry, Friedman informed the sales representative from Wolff Associates, Jerry Keckler (Keckler), that he (Friedman) required a one-year warranty on the rings. Friedman was told that in order for Vargas to provide a one-year warranty, he would have to purchase rings with a gold-plating thickness of at least 100 mil (100 thousandths of an inch), which was Vargas's HGE series. The "HGE" denoted "heavy gold electroplate." Friedman further testified that in order for jewelry to be marked "HGE," the Federal Trade Commission required that the jewelry contain at least 100 mil of gold plating. Friedman testified that it was his understanding from conversations with Vargas's representatives that the rings he subsequently ordered and received, and which were marked "18k HGE," would contain 100 mil of gold plating and would last for at least one year. Friedman further testified that he was told that Wolff Associates was Vargas's sole agent and that any problems with delivery, quality, or consistency of quality should be directed to Keckler and would be handled directly by Keckler.

Between February 3 and March 7, 1986, GCI received shipments of "thousands" of rings from Vargas. By the end of April 1986, GCI had resold most of these rings. About that time, dissatisfied customers were beginning to return rings to Friedman. Some of the rings that had been supplied by Vargas had become discolored at the back of the shank, the very back part of the ring. When Friedman complained to Keckler about this problem in April 1986, Keckler told Friedman that there was no need to worry because

> "first of all, plating was not a perfect science; secondly, some rings would vary considerably in plating and that sometimes the back shank of a ring that would come in contact with a table or with a hard surface would actually receive the least amount of the plating in the tank, and might be as little as twenty or thirty mil."

Keckler explained that people who did a lot of work with their hands and rubbed or banged the rings would wear them out quickly and that people have different acidity rates that affect the color of the rings. Keckler then assured Friedman that any

---

1. Although there does not appear to have been any written contract, it is undisputed that the parties entered into a contract.

mass returns of the rings would be highly unlikely and that he should not worry about the discoloration problem. Friedman might expect a 2½ percent return rate, the same as for fine jewelry sales, Keckler explained. Friedman also wrote two letters of complaint to Nat Wolff, the owner of Wolff Associates, but admitted that he was not sure if the first letter had ever actually been mailed. He testified that he was certain, however, that the second letter of complaint was mailed on or about April 30, 1986.

By the end of April Friedman had become very concerned. Normally his return rate was 2½ percent, but he was now experiencing a return rate of between 8 and 10 percent, which he characterized as "outrageous if the ring was a good ring." Friedman then spoke to Steven Wolff (Wolff), a principal of Wolff Associates, concerning the problems he was experiencing with the rings, specifically, concerning Friedman's desire to have the rings replated. Wolff told Friedman that the rings could not, or would not, be replated because Friedman was getting the rings that he was supposed to be getting and because many of the rings could not be replated because of their structure. Friedman testified that he did not offer to return the rings to Vargas at the end of April because he had sold most of them and they were "coming back in bits and spurts" and because Vargas representatives had already informed him that nothing could be done with the rings that had been returned to him by dissatisfied customers. In June 1986 Friedman testified that Wolff admitted to him that "all rings marked HGE, heavy gold electroplate, were, in fact, not heavy gold electroplate, but were, in fact, anywhere between thirty and fifty mils, and that was a common practice in the industry, to manufacture rings of this nature and illegally mark them."

In August 1986, despite the problems it was experiencing with the rings, GCI began making payments to Vargas for the jewelry that it had received between February and March of that year. Over the course of slightly more than two months, GCI made six separate $1,000 payments, each by check, with the last payment dated October 17, 1986. The first check bore the memo "on account," and the remaining five checks all bore the memo "O/A," which Friedman testified he presumed meant "on account." Three of the checks also indicated the amount of the balance due on the account. Each of the checks was signed by GCI's controller, Sherry Ota (Ota), who was in charge of paying GCI's bills because Friedman was "on the road" most of the year displaying the company's jewelry at trade shows. After the sixth $1,000 payment had been made, Friedman instructed Ota to make no further payments on the Vargas account because of the problems he was experiencing with the rings. In October 1986 Ota notified Vargas's accounts-receivable department by telephone that no additional payments would be forthcoming. By this time, Friedman testified, approximately 25 percent of the rings had been returned by dissatisfied customers. Friedman testified that he authorized the six $1,000 payments despite the problems GCI was experiencing with the rings because he owed Vargas for the percentage of the rings that were not returned, which amounted to approximately 50 percent of the invoicing minus his losses. Friedman testified that 200 to 300 rings of one type and 30 to 40 rings of another type were eventually returned by dissatisfied customers, of which he was able to replate slightly more than half at his own expense and then resell. The replating of a ring, however, was almost as expensive as the original cost of buying the ring.

Upon learning that Vargas rings marked "HGE" did not in fact contain the required 100 mil of gold plating, Friedman began telling other wholesalers of the difficulties he was experiencing and told them not to buy Vargas HGE rings. He told them that they "could wind up in jail" for selling jewelry that is unlawfully marked.

In September 1986 Friedman encountered Wolff at a trade show. Friedman testified that Wolff "cornered me in the hall" and

"warned me that if I continued to badmouth his company in regards to the consistency of quality delivered to other wholesalers, that one of two things would happen; that I, number one, would not make it to the next show, or number two, the owner of Vargas Manufacturing, which

is a subsidiary of Armbrust Chain, would make it extremely difficult for me to exhibit at the United Jewelry Show, being that he was the President of the MJSA, Manufacturing Jewelers and Silversmiths of America, and that my future in the business, if I didn't take care of my problems and keep my mouth shut, was going to be nil."

Friedman further testified that Wolff told him:

"This is Vargas Manufacturing you're dealing with. You're dealing with a division of Armbrust Chain. You're dealing with people who are the largest chain manufacturers in the United States of fine jewelry, not costume jewelry. The guy is the president of the MJSA. If you ever hope to get back into this show, if you ever hope to have any credibility, he'll ruin you. This man is not going to be ruined because of misrepresentations.  *  *  *  How would it look if a fine jewelry manufacturer were making bogus costume jewelry rings? What do you think he would do to you if the word got out?"

Friedman testified that he was never actually prevented from attending any trade shows but that at the next show he was inexplicably moved from a room on the fourth floor to a room on the ninth floor even though his seniority had entitled him to a room on the fourth floor. Room assignments were based on the number of shows in which an exhibitor had previously participated, with rooms on the lowest floors assigned to those exhibitors that had participated in the most shows. Friedman was moved to Room 907, which was the last room on the last floor of the show. Friedman speculated that the reason he was moved to this undesirable location was that he had told other wholesalers that Vargas misrepresents the amount of gold plating on its HGE rings and warned them that they should not buy HGE rings from Vargas. One of the MJSA committee members that determined room assignments for the show also owned Armbrust Chain, of which Vargas was a subsidiary, and Friedman felt that Vargas had manipulated his room assignment to punish him for speaking badly of Vargas to other wholesalers. Friedman testified concerning yet another encounter with Wolff wherein Wolff told him, "Shut up or we'll close you up, and we have ways to do it."

On March 7, 1988, Vargas filed a complaint in Providence County Superior Court against Friedman and GCI, seeking payment of the unpaid balance of $6,573.16 plus interest for the jewelry sold to defendants. On the same day, Vargas filed a motion to attach defendants' equipment and merchandise that was being used and displayed at a jewelry show in Providence. The motion to attach was denied. On March 21, 1988, defendants filed an answer and counterclaim. Count 1 of the counterclaim sought a refund of the $6,000 paid to Vargas on the ground that the merchandise received was not of the same standard or quality for which they had contracted. Count 2 of defendants' counterclaim sought punitive damages based on what appears to be claims of breach of express warranty and misrepresentation. Count 3 of the counterclaim sought punitive damages based on what appears to be claims of breach of implied warranty and misrepresentation.

The case was heard on July 29, 1992, before a justice of the Superior Court sitting without the intervention of a jury. Testimony of the foregoing events was elicited at trial. Additionally the trial justice admitted into evidence, without objection to their content, the reports of two experts who had conducted a series of tests on a Vargas ring marked "18k HGE." The reports stated that the ring contained 50 mil or less of gold plating. All parties also stipulated that the amount of gold electroplating on a ring cannot be determined by the naked eye and that some sort of laboratory analysis or spectroanalysis is required to determine such amount.

The court denied Vargas's complaint for payment of the unpaid balance due. The court found that

"Vargas, in no way, by the most elastic stretch of the most fertile imagination, is entitled to one penny more. It sold defective merchandise. It sold rings that were represented to be 18 karat HGE, which reflects one hundred mil thickness of gold plating, and they were not. The rings that

came back to Mr. Friedman, he had to replate himself, if he could. There's no question in my mind that that which Vargas sold him was defective, at least in the sense that it didn't measure up to the one hundred mil requirement. Frankly, I think Mr. Friedman was more than generous in making the payments that he did. In fact, I might go so far as to say he was downright philanthropic."

The court granted Vargas's motion for directed verdict on count 1 of defendants' counterclaim that had sought the refund of the $6,000 already paid to Vargas. Friedman had conceded that he owed Vargas this amount for the percentage of jewelry that had not been returned by dissatisfied customers, so he was not entitled to a refund of the money already paid.

With respect to counts 2 and 3 of defendants' counterclaim, the court noted that damages should not be awarded when they are speculative. The court held that it had no doubt that there was indeed a breach of implied warranty as well as misrepresentation but found that defendants produced "a paucity of evidence" concerning damages incurred as a result of this misconduct. The court, therefore, awarded only nominal damages of $5 on each count.

The court found, however, that the conduct of Wolff, "the acknowledged agent of Vargas," regarding the threats made to Friedman "reflect[ed] evidence of willfulness, recklessness and wickedness, amounting to criminality." It therefore awarded defendants $20,000 in punitive damages on each of counts 2 and 3 of the counterclaim, for a total award of $40,000 in punitive damages.

After judgment was entered, Vargas filed a motion for new trial with respect to the award of punitive damages. The motion was denied. Vargas now appeals to this court from the denial of its motion for new trial and from the judgment entered below. Additional facts will be furnished as needed to deal with specific issues.

I

Vargas claims that the trial court erred in denying its complaint for payment of the unpaid balance of $6,573.16 plus interest. It claims that by making payments after learning that the rings were not heavy gold electroplate and, moreover, by marking each check "on account" and by indicating on three of the checks the amount of the balance then due, defendants thereby affirmed their obligation to pay the remaining balance. We disagree.

▮ Friedman explained at trial that he authorized payments to be made even after learning that the rings were not heavy gold electroplate because he owed Vargas for the percentage of the rings that had been sold and that had not been returned. He testified that this unsold portion amounted to about 50 percent of the invoicing minus his losses. We agree with the trial court that by remitting these payments, defendants did not affirm that they owed Vargas for the entire invoiced amount. We also reject the argument that the notations on each check signifying "on account" and on three of the checks indicating the amount of the balance then due constituted an affirmation by defendants of the debt and balance due.

Initially, we note that it was GCI's controller, Ota, who made out the checks to Vargas because Friedman was away at jewelry shows. Prior to October 1986, Ota had no ownership interest in GCI. She became a part owner in October 1986. Five of the six checks made out to Vargas were dated before Ota became a part owner of GCI. At trial Vargas's counsel argued that by including the notation "on account" on each check and the amount of the balance due on three of the checks, GCI had thereby waived any defenses it had against Vargas and was estopped from asserting any such defenses. Responding to Vargas's counsel, the trial justice stated:

"I part company with you entirely on the waiver and estoppel theory. The fact that his bookkeeper, who at that time wasn't part owner, later became a principal of the company when she wrote the check on account. This man testified that every week of the year, he's on the road, and this woman is back at the ranch minding the store. So, I'm not at all persuaded that by the fact she put 'on account' somewhere on

the location of the check, that he's waived something. I part company with you entirely on that."

We note that on appeal Vargas does not use the terms "waiver" or "estoppel" but rather contends that such notations on the checks constituted an affirmation or a promise to pay the remainder of the balance due.

▪ An employer is liable for the acts of an employee when the employee is acting within the scope of his or her employment. *See, e.g.,* Restatement (Second) *Agency* §§ 140, 228 (1958). Making out checks and writing memoranda thereon were certainly acts within the scope of Ota's employment as controller of the company. Thus the fact that Ota wrote the notations on the checks rather than Friedman is immaterial. We are not persuaded, however, that the purpose of the notations on the checks sent to Vargas was to affirm the obligation to pay the balance due—or that they had the effect of doing so. We reject this argument.

Vargas further asserts that no documentary evidence was introduced that any rings it supplied to defendants were ever returned to GCI by dissatisfied customers or that defendants suffered any losses. It also claims that the trial court "admitted that there was no evidence of any damages." It is true that no *documentary* evidence was ever introduced concerning these matters, but there was oral testimony by Friedman that approximately 200 to 300 rings of one type and 30 to 40 rings of a second type were returned. He also testified that he replated at his own expense those returned rings that were salvageable and that the reprocessing cost him almost as much as the original rings.

▪ Oral testimony is every bit as much evidence as a written document. It is incumbent upon the trier of fact to assess the credibility of witnesses and to determine the weight to be afforded such testimony. Here the trial justice determined that Friedman was a very credible witness. With respect to his testimony, the trial justice stated, "I credit Mr. Friedman entirely." The trial justice's credibility findings are afforded great weight by this court. *See Scotto v. Zifcak,* 425 A.2d 512, 514 (R.I.1981). Thus there certainly was evidence that rings were returned to GCI by dissatisfied customers and that Friedman and GCI incurred expenses in salvaging those rings that were capable of being saved.

▪ With respect to Vargas's claim that the trial court found there was no evidence of any damages, this assertion misapprehends the trial justice's findings. The trial justice found that defendants introduced insufficient evidence to calculate with any reasonable degree of accuracy the amount of damages they sustained. He did not find that there was no evidence that defendants suffered any damages.

▪ The standard of review of a trial justice sitting without a jury is that decisions of the trial justice will not be overturned unless he or she misconceived or overlooked relevant evidence or was otherwise clearly wrong. *O'Donnell v. State,* 474 A.2d 1244, 1246 (R.I.1984). In the case at bar the evidence was uncontroverted that Vargas and/or its agents intentionally misrepresented the amount of gold plating in its HGE rings in order to induce Friedman and GCI to purchase them. Friedman had no reason not to, and did in fact rely, on these representations in contracting to purchase the rings. When Friedman began getting returns from dissatisfied customers, he was assured by Vargas's agent, Keckler, that there was no need to worry. Friedman did not offer to return the rings to Vargas at that time because almost all of them had been resold and were coming back to him in spurts. When he did tell Wolff that he wanted Vargas to replate the returned rings, Wolff told him that the rings either would not or could not be replated. According to Friedman two months later Wolff admitted that Vargas's HGE rings contained only 30 to 50 mil of gold electroplate, not the 100 mil that had been represented to Friedman, and that that was the standard practice in the industry with rings classified as heavy gold electroplate. Friedman replated at his own expense those salvagable rings that had been returned to him by dissatisfied customers. Upon learning that Friedman was telling other wholesalers not to buy Vargas's HGE rings, Wolff threatened him with physical harm and told him that Vargas

would put him out of business if he did not keep quiet. Although the court found that Friedman did not present enough evidence from which his actual damages could be determined, it was satisfied that Vargas had committed a breach of warranty and misrepresentation. The court also heard testimony from Friedman that he paid for the rings that had not been returned to him, which amounted to approximately 50 percent of the invoicing minus his losses.

The trial justice found that Friedman was more than generous in paying $6,000 for rings of inferior quality and that Vargas was not "entitled to one penny more." Although the trial justice found that defendants did not produce sufficient evidence from which their actual damages could be calculated, a quantification of such damages is implicit in the trial justice's determination that defendants were relieved from making any further payments. We are in agreement with the trial justice that Vargas should not recover the entire contract price when it contracted to supply rings containing 100 mil of gold electroplate but in reality knowingly, willfully, and surreptitiously supplied rings containing half that amount or less. When we consider the totality of the circumstances summarized above, we are of the opinion that the trial justice did not misconceive or overlook relevant evidence, nor was he otherwise clearly wrong in denying Vargas's complaint for payment on the contract. We have carefully considered Vargas's remaining arguments with respect to its complaint for payment and find them to be without merit. The judgment of the trial court denying Vargas's complaint is affirmed.

## II

■ Vargas presses a number of reasons why the award of punitive damages should be reversed. We shall not address each reason because our disposition of one renders consideration of Vargas's remaining claims moot. Vargas asserts that the trial court committed reversible error by awarding punitive damages based on conduct that was not complained of in defendants' counterclaim. We agree.

The defendants sought punitive damages in counts 2 and 3 of the counterclaim *solely* with respect to the knowing, intentional, and willful misrepresentations made by Vargas and its agents that the rings supplied were heavy gold electroplate. The counterclaim not only does not request punitive damages based on the threatening statements made by Wolff but makes absolutely no mention of the threats whatsoever. The trial justice made the following remarks concerning his award of punitive damages:

"The recitation of the events which surrounded the conversations that Mr. Friedman disclosed at the September, 1986 show; Mr. Friedman indicated he was cornered in the hallway and warned by Mr. Steve Wolff, the acknowledged agent of Vargas, that if he continued to 'bad-mouth Vargas,' Friedman wouldn't make it to the next show and/or his presence at any future Rhode Island jewelry show was nonexistent. It was rather compelling testimony. Subsequently, in 1988, he was confronted again, and told by Steve Wolff, 'Shut up or we'll close you up,' a comment that apparently even Keckler apologized to him for later. It was equally compelling. That testimony was unrebutted, uncontradicted and wholly credible. Vargas could have, if it had wanted to, brought Mr. Wolff, brought Mr. Keckler or any other witness to those conversations to court and contradicted Mr. Friedman's recitation of those events. Vargas chose not to do so. Accordingly, the testimony stands firm and uncontradicted and alarming. It is, without question, conduct which reflects evidence of willfulness, recklessness and wickedness, amounting to criminality. It is, in no small sense, nothing short of extortion, and probably a few other criminal offenses, if I sat down with the Criminal Code and perused it.

"Accordingly, punitive damages should be, ought to be, shall be and hereby are awarded."

The trial justice based his award of punitive damages solely on the threatening statements made by Wolff to Friedman, even though punitive damages were not requested on this basis in defendants' counterclaim.

In *Santos v. Santos,* 568 A.2d 1010 (R.I. 1990), a husband, following a divorce, filed a motion to modify a support order. After hearing the husband's motion to decrease support, the trial justice ordered that the support payments be increased. We granted the husband's petition for certiorari and quashed the order increasing the amount of his support payments. *Id.* at 1011.

In *Santos* we noted that both parties appeared before the trial justice with the expectation of arguing the merits of a motion to decrease support. In light of that fact, "the husband found himself in the precarious situation of defending against what amounted to an entirely unexpected determination on the part of the trial justice to increase the support paid by the husband." *Id.* We thus rejected the trial justice's sua sponte decision to increase the husband's support payments. *Id.* We reached a similar conclusion in *Pazienza v. Pazienza,* 595 A.2d 235 (R.I.1991). In that case the trial justice sua sponte changed the custody arrangement of a child when there was no motion before the court requesting a change in custody. We held that even though the change in custody might have been in the best interest of the child, it was improper for the trial justice to have considered and ruled on the question sua sponte. *Id.* at 241; *see also Harrigan v. Mason & Winograd, Inc.,* 121 R.I. 209, 213, 397 A.2d 514, 516 (1979) ("a court is presumed not to intend to grant relief which was not demanded").

■ In the case at bar we have a situation in which the trial justice, presented with a counterclaim seeking punitive damages based solely on misrepresentation, sua sponte awarded punitive damages based upon threats made by Vargas's agent that the trial justice found amounted to the crime of extortion. Although we cannot say that we disagree that some of Wolff's statements would indeed constitute the crime of extortion, nevertheless, the fact remains that the defendants never requested punitive damages based on Wolff's threats to Friedman. We note that the defendants could have amended their counterclaim pursuant to Rule 15 of the Superior Court Rules of Civil Procedure to include such a request but failed to do so.

Vargas was not afforded notice that it could be liable for punitive damages on this ground and thus did not have a meaningful opportunity to present argument in opposition. We therefore believe that the trial justice erred in awarding punitive damages on a basis that was not requested in the defendants' counterclaim. We are not persuaded by the defendants' argument that the threats arose out of the misrepresentation and that, therefore, the trial justice's award of punitive damages was made on a basis that was in fact requested in the counterclaim.

For the reasons stated, the judgment of the Superior Court is affirmed in part and the award of punitive damages is reversed. The papers in the case may be remanded to the Superior Court.

LEDERBERG and BOURCIER, JJ., did not participate.