DECISION
This matter was heard by the Court sitting with a jury in November 1997. At the conclusion of the trial, and prior to deliberations, the parties waived the jury. Judgment was reserved, and the parties agreed to submit post-trial briefs.
Travel/Facts
The undisputed facts are as follow. In April 1984, the plaintiffs, Jose Cardoso (Cardoso), Ines Cardoso, and Antonio Ferreira (Ferreira) borrowed $95,000 at a seventeen percent interest rate from the defendants, Alfred Mendes (Mendes) and Maria Mendes, for the purpose of purchasing a liquor store business, Tracy Holding Company, located on Dexter Street, Central Falls. The plaintiffs signed a promissory note which stated that the monthly installment payments of $1,393.48 would become due on June 1, 1984. The note was secured by two mortgages, one on the Cardoso residence, at 357 Mendon Avenue, Pawtucket (357 Mendon), and the other on a property owned by Ferreira's parents, Felissimo and Maria Ferreira.
On April 3, 1989, the plaintiffs borrowed an additional $260,000 from the defendants in order to purchase 603-605 Hunt Street (Hunt Street Property) for the purpose of relocating the liquor store. The plaintiffs signed another promissory note, this time at a fifteen percent interest rate, and secured the note with mortgages on the Hunt Street property and on a property on Oakwood Avenue in Cumberland. The only attorney present at the closing was Mr. Jack Gannon.
In January, 1990, Cardoso and his wife purchased a house at 361 Mendon Avenue, Pawtucket (361 Mendon) for $95,000. This house was financed by Albert Mendes, son of the defendants, Alberto 
Maria. In 1991, the defendants took a second mortgage on 361 Mendon, and the plaintiffs signed another promissory note for $35,000.
In 1992, the plaintiffs decided to sell both the business and the Hunt Street property. They found two buyers, brothers Jose and Juan Vasquez (the Vasquezes). The purchase price for the Hunt Street Property was $330,000. The purchase price for the business was $70,000. Mendes, who had never met the brothers before, agreed to finance $260,000 of the Hunt Street property purchase price and directed his attorney, Mr. Gannon, to draw up the papers. The purchase and sale agreement, which was signed by the plaintiffs and the Vasquezes, contained a specific provision which states:
 "Further, Sellers hereby agree to provide their personal guaranty to the Lender and to provide security for that guaranty in their personal residences. The undersigned have read the foregoing and by signing fully agree to be bound by same." Defendants' Exhibit, No. G.
The closing on the Hunt Street property occurred on February 22, 1993. Present were Alfredo Mendes, Jose Cardoso, Ines Cardoso, Maria Ferreira, Jose Vasquez, Juan Vasquez and Attorney Gannon. Although Antonio Ferreira was not present, he signed the papers at a later time. Among the documents signed by Cardoso and Ferreira were unconditional personal guarantees of the Vasquezes loan, secured by mortgages on 357 Mendon and on Ferreira's residence, at 47 Oakwood Avenue, Cumberland.
The H.U.D. Settlement Statement on the Hunt Street property listed the contract sales price as $330,000, and the gross amount due from Vasquez as $337,360.00.[1] The principal amount of the new loan from Mendes was listed as $260,000, and after accounting for the earnest money and various other adjustments, the balance due from Vasquezes was $48,381.51. On the sellers' (plaintiffs') side of the settlement statement, the gross amount due to seller is listed as $335,000. Under the heading "Reductions in Amount Due to Seller," the payoff of the first mortgage loan is listed as $298,835.79. After accounting for all other reductions, the total reduction amount due seller is listed as $335,000.00 and when applied to the gross amount due to seller, the balance due seller is $0.00.
In September, 1994, Mendes, through his attorneys, Jack Gannon and Robert McCorry, Jr., informed the Cardosos that he would begin foreclosure proceedings on 361 Mendon for failure to make payment on the $35,000, second mortgage. The plaintiffs filed a Motion for a Preliminary Injunction in order to prevent the foreclosure sale, and later amended the Complaint to add additional counts.
Meanwhile, the Vasquezes made regular payments on the Hunt Street property until they declared bankruptcy in July, 1995. Subsequently, on October 26, 1995, Mendes foreclosed on the Hunt Street property and, as the highest bidder at the foreclosure sale, purchased the property for $85,000. Mendes then sent a statement of accounting and resulting deficiency, dated May 1, 1996, to the plaintiffs. In the letter, Mendes stated that as guarantors of the Vasquezes' mortgage and note the plaintiffs' failure to make adequate and immediate payment of the deficiency owed by the Vasquez brothers would result in foreclosure of the mortgage on 357 Mendon Avenue, Pawtucket. The letter stated further that the principal balance due as of October 26, 1995, was $233,696 and that the interest, as of April 30, 1996, amounted to $29,103.39. After adding various expenses and subtracting the foreclosure sale price, the letter stated that the figure for the total deficiency balance owed by the plaintiffs, as of May 1, 1996, was $194,928.60. The plaintiffs failed to respond to Mendes' letter.
On July 15, 1996, Justice Israel denied the plaintiffs' Motion for a Preliminary Injunction against foreclosure on 361 Mendon, and on July 25, 1996, the Rhode Island Supreme Court refused to grant a stay of the foreclosure sale. Subsequently, the defendants did not foreclose on the $35,000.
The plaintiffs and the defendants have presented conflicting testimony of the underlying events which surround the various loan transactions.
1984 — The Loan to Purchase the Liquor Business
Cardoso, a Portuguese immigrant, testified that he does not read or write English. He testified further that when he decided to establish a business with his cousin, Antonio Ferreira, he approached Mendes for financing because Mendes was an old friend of the family and a successful businessman in the Portuguese community.
Both Cardoso and Ferreira testified that from the beginning, they made regular payments for the full amount as required by the promissory note, namely $1,393.48 per month. Furthermore, the plaintiffs testified that at Mendes' request, these payments were made in cash; that they placed the cash in manila envelopes; that they never received any receipts or 1099 forms for tax purposes; and, that each month they kept track of their payments by crossing off the relevant line on the amortization schedule provided by the defendants. The plaintiffs noted, however, that in September of 1990, they made a $20,000 payment by check. The plaintiffs stated that on the advice of Mendes, they were not represented by an attorney, and that Attorney Gannon represented the defendants at the closing.
In contrast, Mendes testified that prior to, during, or subsequent to the closing, he and the plaintiffs came to a "gentleman's agreement," whereby the plaintiffs would not be required to make any payments for the first three years of the loan. As a result, Mendes testified, the plaintiffs made no payments until 1988, and that from 1987 to 1989, the plaintiffs paid approximately $8,100 on the loan and made only one payment of $20,000 in 1990. Mendes' Loan Repayment Schedule for the $95,000 loan reflects payment of this $20,000 on January 1, 1990. Mendes denied that Gannon was his attorney at the 1984 closing and stated, instead, that Gannon had represented the plaintiffs.
1989 — The $260,000 Loan to Purchase the Hunt StreetProperty
Mendes testified that in 1989, he loaned $260,000 to the plaintiffs in order to facilitate the plaintiffs' purchase of the Hunt Street property and, like the previous loan, they did not make regular payments. In fact, according to Mendes, between 1989 and 1993, the plaintiffs paid a total of only $25,000 on this loan.
In contrast, the plaintiffs testified that apart from the three missed payments in late 1991, they made regular, full payments on the Hunt Street property loan in the same manner as they did on the previous loan — cash in manila envelopes. They also testified that, like the previous loan, Mendes did not provide them with any receipts or 1099 forms. In addition to the regular cash payments on this loan, the plaintiffs testified that in November, 1990, they made a lump sum cash payment of $10,000 which had been withdrawn from a savings account, and in April, 1992 they paid $25,000 by check. The plaintiffs again stated that they kept track of their payments by crossing off the relevant line on the amortization schedule provided by the defendants.
The plaintiffs stated that again, Mendes told them that they did not need an attorney as his attorney, Gannon, would handle the closing.
1990 — The $95,000 Loan to Purchase 361 Mendon
Cardoso testified that, in 1990, he and his wife decided to purchase 361 Mendon and approached Mendes for the purpose of negotiating a loan. Cardoso stated that Mendes was unwilling to finance the purchase, but suggested that they talk to his son and daughter to see whether they would be interested in making the loan. Mendes essentially verified Cardoso's testimony, testifying that although the plaintiffs had made virtually no payments on the 1984 and 1989 loans, he nevertheless recommended to his son that his son make the new loan to the Cardosos. Mendes also admitted that he financed part of said loan but was not sure of the exact figure.
1991 — The $35.000 Loan
The plaintiffs testified that as a result of missing the three payments on the Hunt Street property in 1991, Mendes insisted that the plaintiffs sign a promissory note for $35,500 which would be applied to the Hunt Street Property and would be secured by a second mortgage on 361 Mendon. Cardoso testified that he did not receive any money in return for signing the 1991 note and that since the signing, he has made monthly cash payments of $443.75.
Mendes maintains that the plaintiffs have made absolutely no payments on this loan. The defendants' record of payments indicates that a sum of $35,500 was applied against interest due on the Hunt Street property loan on September 17 1991. No record of the promissory note for this transaction was produced at trial.
1993 — Sale of the Hunt Street Property
In 1993, the plaintiffs decided to sell both the Hunt Street property and the liquor business. After finding buyers, the plaintiffs testified that they notified Mendes of their intentions to sell and that Mendes agreed partially to finance the deal. The plaintiffs stated that they did not participate in the negotiations between Mendes and the Vasquezes, but that they signed the purchase and sale agreement. In a separate transaction, the plaintiffs sold the business to Vasquezes for $70,000, whereby the Vasquezes would pay a $5,000 deposit and make monthly payments of $668.00 for the balance.
Cardoso testified that prior to signing any of the papers, he and Mendes made an oral agreement concerning how the transaction would occur. Cardoso claimed that Mendes orally agreed to release the plaintiffs from all debt owed by the plaintiffs on the Hunt Street property and also release the plaintiffs from the mortgages on their homes, provided: (1) that they pay Mendes the $5,000 deposit due the plaintiffs for the sale of the business; (2) that the Vasquezes make a mandatory installment payment of $25,000; and, (3) that the plaintiffs give Mendes the monthly $668.00 which they receive from the Vasquezes for the sale of the business. Cardoso further testified that he believed that once the deal went through as agreed, the only surviving obligations owed to Mendes by the plaintiffs after the closing would be the monthly payments of $443.00 on the $35,000 mortgage; the monthly payments of $668 from the Vasquezes; and, the remaining monthly payments on the $95,000 mortgage for 361 Mendon.
Cardoso testified that he did not have an attorney to represent him during the course of the negotiations and closing. He stated that he signed all of the papers which were handed to him by Gannon, but that nobody explained to him that he was signing a personal guaranty or that he was giving a mortgage on his residence. He testified that because he does not read or write English, he did not understand the full significance of the documents which he signed at that time and that he trusted Mendes would fulfill the terms of their oral agreement.
Mendes testified that he never made any oral agreement with Cardoso. He further testified that he agreed to finance the loan to the Vasquezes only on condition that Mendes would receive security in the form of a first mortgage and note on the Hunt Street property from the Vasquezes, and that the plaintiffs personally guarantee the loan and give mortgages on their residences for the full amount of the loan. Mendes admitted that he directed his attorney, Gannon, to draw up the purchase and sale agreement and the closing documents, including the personal guaranty.
Non-Jury Trial
Although this case was presented to a jury, at the conclusion of the trial and prior to deliberations, the parties agreed to waive the jury.
In a non-jury trial, "the trial justice sits as a trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, [s]he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981). "It is also the province of the trial justice to draw inferences from the testimony of witnesses. . . ." Id. See alsoRodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983)(The question of who is to be believed is one for the trier of fact).
The record and testimony before this Court is confused, contradictory and presents two very different accounts of the events which surround this controversy. Consequently, this Court must weigh the credibility of the witnesses and draw appropriate inferences. "[I]nferences drawn from contradictory evidence are properly within the domain of the trier of facts." Soucy v.Martin, 121 R.I. 651, 656, 402 A.2d 1167, 1170 (1979). "[Wlhere the trier of fact expressly accepts the testimony of a witness, which testimony is in conflict with that of another, the acceptance of one is an implied rejection of the other." State v.Correia, 106 R.I. 655, 663, 262 A.2d 619, 624 (1970)
Much of the evidence presented in this case was in the form of oral testimony; however, "[o]ral testimony is every bit as much evidence as a written document." Vargas ManufacturingCompany v. Friedman, 661 A.2d 48, 53 (R.I. 1995). "It is incumbent upon the trier of fact to assess the credibility of the witnesses to determine the weight to be afforded such testimony."Id.
The plaintiffs assert various claims against the defendants including payment; tender and payment; false and deceptive practice; fraud; duress; mistake of fact; emotional pain and suffering; unconscionability; and violation of R.I.G.L. 1956 § 19-25.3-1 et seq., and R.I.G.L. § 19-25-2.1 et seq. Prior to trial, the plaintiffs waived any claims under R.I.G.L. § 19-25.3-1 et seq., and R.I.G.L. § 19-25-2.1 et seq. The defendants raised affirmative defenses including estoppel; substantial and material breach of contract; set off; and unclean hands of the plaintiffs.
The Parol Evidence Rule
Both parties in this matter allege the existence of oral agreements which modify written contracts. The plaintiffs allege that there was an oral agreement to make all of the payments in cash.[2] In addition, the plaintiffs allege that prior to the $260,000 Vasquez loan, Mendes orally promised that, upon payment by the Vasquezes of $25,000 and monthly payments of $688 from the plaintiffs, he would release them from the proposed guaranty. In contrast, Mendes alleges that with respect to the $95,000 loan in 1984, the parties made a "gentlemen's agreement," whereby the plaintiffs would defer repayments on the loan for three years. The plaintiffs took advantage of this agreement, Mendes asserts, and that is the reason why virtually no payments were credited to the plaintiffs during the initial repayment period. Mendes denies the existence of any oral agreement which might release the plaintiffs from the guaranty. The plaintiffs deny the existence of the "gentlemen's agreement."
In the absence of fraud or mistake, parol evidence is not admissible to vary or alter or contradict a written agreement.St. Paul Fire Marine Insurance Company v. Russo Brothers, Inc.,641 A.2d 1297, 1299 (R.I. 1994). The parol evidence rule "prohibits the introduction of extrinsic evidence to change, or alter the written terms of an agreement, unless the evidence is offered to show fraud, mistake, or a condition precedent to the existence of a contract. Lisi v. Marra, 424 A.2d 1052, 1055 (1981). Parol evidence may also be admitted to supplement an agreement that is incomplete or ambiguous on its face. Id. "The basis of the rule is that a complete written agreement merges and integrates all the pertinent negotiations made prior to or at the time of execution of the contract. Fram Corporation v. Davis,121 R.I. 583, 587, 401 A.2d 1269, 1272 (1979). "[W]here payment terms in a promissory note are clear and unequivocal, evidence of a prior or contemporaneous oral agreement cannot be used to vary or contradict the provisions of the note regarding payment." Lisi, 424 A.2d at 1055.
In order to determine whether or not parol evidence is admissible to alter any of the written contracts under review, this Court must first examine the exceptions to the rule.
(a) Mistake of Fact
The plaintiffs allege that due to their lack of legal counsel, they did not understand the relevant terms and conditions of the agreements and that this amounts to a mistake of fact. This claim proves unavailing to the plaintiffs.
"In the absence of fraud, equity will reform a written instrument when it appears that there has been a mutual mistake in its execution." Ferla v. Commercial Casualty InsuranceCompany, 74 R.I. 190, 195, 59 A.2d 714, 716 (1948)(emphasis in the original). "[S]uch a mistake must be proved by clear and convincing evidence." Id. (refusing to excuse an insured, who could not read English, from an obligation to inform the insurer that a policy was not of the nature desired). "The rule that bars the introduction of facts dehors the contract when its language is clear and complete on its face does not prevent a court form considering such extrinsic evidence if, by reason of a unilateral mistake common to both sides of the contract, the written document fails in some material respect to correctly reflect their prior agreement. Marr Scaffolding v. Fairground Forms,682 A.2d 455, 459 (R.I. 1996). In such instances, extrinsic or parol evidence should be admitted for the purpose of reforming the contract to mirror the true intent of the parties. Id.
However, "[o]ne who manifests acceptance of the terms of a writing which he should reasonably understand to be an offer or proposed contract, is bound by the terms of the writing or of its proper interpretation. Westerly Hospital v. Higgins,106 R.I. 155, 160, 256 A.2d 506, 509 (1969). Ignorance of the contents of a writing is not a defense to an action thereon. Id. "[T]he usual rule is that if there is no fraud, duress, or mutual mistake, one who has the capacity to understand a written document who reads and signs it, or, without reading or having it read to him, signs it, is bound by his signature as to all of its terms. Id. InWesterly Hospital, our Supreme Court found that ignorance of the nature of an agreement merely indicates a unilateral mistake and does not constitute a defense in an action on a promissory note.Id.
In the instant case, the plaintiffs have alleged that a mistake of fact exists, but they have failed to introduce any evidence, much less clear and convincing evidence, of such mistake. Although great emphasis has been placed upon Cardoso's difficulties with the English language, there has been no similar claim made with regard to Ferreira, and nothing prevented him from translating the terms of the contracts to Cardoso. The fact that the plaintiffs were not represented by legal counsel, whether or not at the urging of Mendes, does not excuse any failure to understand the written terms of the agreements. In addition, even if both of the plaintiffs misunderstood the contracts, and this could be construed as a mistake, such mistake would be unilateral on the part of the plaintiffs and unknown to Mendes. Therefore, the mutual mistake exception to the parol evidence rule does not apply here.
(b) False and Deceptive Practice — Fraud
The plaintiffs allege that Mendes committed fraud in connection with the $95,000 loan in 1984, the $260,000 Vasquez loan in 1993 and the $35,000 loan in 1991. As a result of relying on the defendant's false representations, as well as his false and deceptive conduct, the plaintiffs allege that they suffered damages. Interestingly, both parties have accused the other of a desire to conduct all transactions in cash for the purpose of evading taxes. The defendants assert that such conduct evidences the unclean hands of the plaintiffs.
Our Supreme Court has stated that "[f]raud vitiates all contracts." LaFazia v. Howe, 575 A.2d 182, 185 (R.I. 1990). A person who has been induced by fraud to enter into a contract may pursue either one of two remedies: rescind the contract or affirm the contract and sue for an action for deceit. Id. at 184. The right to rescind a contract must be exercised with "reasonable promptness" after discovery of the facts that give rise to the right. Id.
 "The distinction between a claim for damages for intentional deceit and a claim for recision is well defined. Deceit is a tort action, and it requires some degree of culpability on the misrepresenter's part. . .An individual who sues in an action of deceit based on fraud has the burden of proving that the defendant in making the statements knew that they were false and intended to deceive him . . . On the other hand, a suit to rescind an agreement induced by fraud sounds in contract." Halpert v. Rosenthal, 107 R.I. 406, 412, 267 A.2d 730, 733 (1970)
"It is fundamental to actions predicated on the theory of deceit that the party claiming deceit present evidence that shows that he or she was induced to act because of his or her reliance upon the alleged false representation. LaFazia, 575 A.2d at 185. "Misrepresentation is defined as. . ."any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts."" Id. (citing RESTATEMENT (SECOND) OF CONTRACTS § 470 at 890-891). The question is not whether the representation is knowingly false, but whether the other party believed it to be true and thus was misled by such a representation into making the contract." Id.
"Fraud in the inducement is defined as "[m]isrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken."" Bourdon's v. Ecin Industries. Inc., et al.,704 A.2d 747, 753 (R.I. 1997)(citing BLACK'S LAW DICTIONARY 661 (6th ed. 1990)).
(i) The $35.000 Loan in 1991
The plaintiffs allege that the defendants committed fraud in 1991, when the defendants gave no consideration for the $35,000 loan. The plaintiffs testified that as a result of missing three payments on the Hunt Street property in 1991, Mendes insisted that the plaintiffs sign a promissory note for $35,500, which would be applied to the Hunt Street Property and would be secured by a second mortgage on 361 Mendon. Cardoso testified that he did not receive any money in return for signing the 1991 note and that he made monthly cash payments of $443.75 on the loan. The defendants' record of payments indicates that a sum of $35,500 was applied against interest due on the Hunt Street property loan on September 17, 1991. The promissory note was not introduced at trial.
"Consideration consists either in some right, interest, or benefit accruing to one party or some forbearance, detriment, or responsibility given, suffered, or undertaken by the other."Marcotte v. Harrison, 443 A.2d 1225, 1231 (R.I. 1982). In this case the evidence does not establish that any consideration was given for this loan. The plaintiffs did not accrue any right, interest or benefit; instead, they merely assumed an even greater debt than they had previously incurred. As for the defendants, although their record of payments indicates that a sum of $35,500 was applied against interest due on the Hunt Street property loan, this Court does not view such a record as credible due to the inconsistencies in the testimony of Mendes. This Court finds that the $35,000 "loan" was not supported by consideration and that the contract is void and unenforceable. Consequently, the second mortgage on 361 Mendon is void.
(ii) The $95,000 Loan in 1984
The plaintiffs allege that Mendes committed fraud in connection with the $95,000 loan in 1984, because he never intended to credit any of their payments.[3] At trial the plaintiffs testified that they made monthly payments of $1,393.48, as required by the note. They further testified that Mendes requested these payments in cash, and that he neither gave them any receipts nor gave them any 1099 forms.[4]
In response, Mendes testified that the reason for not crediting any payments is that no payments were made. He stated that the plaintiffs did not have to make any payments on the loan because, prior to, during or subsequent to the loan, the parties orally agreed that all of the payments would be deferred for the first three years of the loan. Mendes referred to this oral agreement as a "gentlemen's agreement." Mendes further testified that the plaintiffs did not make any payments on this loan until 1988. The plaintiffs deny the existence of the "gentlemen's agreement."
At issue is whether the written contract may be modified by the "gentlemen's agreement" under the parol evidence rule. At trial, Mendes testified that the "gentlemen's agreement" was made prior to, during, or subsequent to the closing. The parol evidence rule only applies only to agreements made prior to or contemporaneous to an agreement. Consequently, if the "gentlemen's agreement" occurred after the loan was made, evidence of the agreement would be admissible.
However, this Court does not find Mendes' testimony to be credible. Mendes testified that he loaned $95,000 to the plaintiffs in 1984; that he received virtually no payments on the $95,000 loan until 1990; and, that in 1989 he loaned the plaintiffs an additional $260,000. Mendes alleged that the "gentlemen's agreement" explains why he made the second loan despite the fact that the plaintiffs had not made the required payments on the first loan. This Court does not believe that a "gentlemen's agreement" ever existed; instead, it believes that Mendes concocted the whole story in order to justify why he lent additional money to the plaintiffs when allegedly they had made virtually no payments on a previous loan. Furthermore, the convenient lapse of memory exhibited by Mendes concerning the timing of the "agreement" indicates that he was being deliberately vague in order to evade the parol evidence rule and introduce the agreement as evidence.
(iii) The $260,000 Loan in 1989
The plaintiffs allege that Mendes committed fraud in connection with the $260,000 Vasquez loan in 1991 when he induced the plaintiffs into signing the guaranty by promising that after the closing, the only surviving obligations owed to Mendes by the plaintiffs would be the monthly payments of $443.00 on the $35,000 mortgage; the monthly payments of $668 from the Vasquezes; and, the remaining monthly payments on the $95,000 mortgage for 361 Mendon. Cardoso testified that he did not become aware of Mendes' failure to carry out his promise until much later, and that shortly thereafter Mendes instituted foreclosure proceedings on the Cardoso residence which resulted in the filing of the present action.
Mendes denies the existence of this oral agreement. He testified that he did not know the Vasquezes at the time of the transaction, and that the purpose of the personal guaranty was to protect his investment.
After listening to both sides on the issue, this Court finds credible the testimony of the plaintiffs and believes that the plaintiffs were fraudulently induced into signing the personal guaranty as a consequence of relying upon Mendes' promises. Because the plaintiffs entered into this contract as a result of a misrepresentation which gave them a false impression or understanding of the risks, duties or obligations they had undertaken, this Court finds that the fraud exception to the parol evidence rule applies to the guaranty. Therefore, unless the unclean hands doctrine applies, this Court will consider evidence of the oral agreement:
 The doctrine of 'unclean hands' "is not a license to destroy the rights of persons whose conduct is unethical. The rule is that unrelated bad conduct is not to be considered against the plaintiff. It is only when the plaintiff's improper conduct is the source, or part of his equitable claim, that he is to be barred because of this conduct. What is material is not that the plaintiffs' hands are dirty, but that he dirties them in acquiring the right he now asserts." Rodriques v. Santos, 466 A.2d 306, 311 (R.I. 1983)(internal citations omitted).
The doctrine of unclean hands becomes operative only when a complainant must depend on his own improper conduct to establish his rights against other parties to the suit. Id.
Mendes alleges that the plaintiffs made their payments in cash for the purpose of evading taxes. Quite apart from the fact that this contradicts Mendes' assertions that the plaintiffs did not make the cash payments claimed by the plaintiffs, such alleged tax evasion is not the source or part of the plaintiffs' equitable claim. Consequently, the doctrine of unclean hands defense is not applicable to the Vasquez loan guaranty and must fail.
This Court finds that the plaintiffs were fraudulently induced into signing the guaranty by the oral promises made by Mendes and that the parol evidence rule does not apply to the agreement. The evidence reveals that he conditions of the oral promise were satisfied; therefore, the guaranty was discharged and the accompanying mortgages on 357 Mendon and 47 Oakwood Avenue must be released.
Duress
The plaintiffs allege that as a result of Mendes' influence, his false and coercive conduct, and his actions in discouraging the plaintiff from obtaining legal counsel, the plaintiffs involuntarily entered into various agreements to their financial detriment and without any understanding of the relevant terms and conditions of said agreements.
"Duress does not render a contract void, merely voidable, but the victim may ratify the agreement by failing to object." McGeev. Stone, 522 A.2d 211, 214 (R.I. 1987). "A party asserting duress must act promptly or be deemed to have affirmed the conduct in question." Id. A party who has received the benefit of the performance of a contract will not be permitted to deny his or her obligations unless paramount public interest requires it.Id. at 215.
In the instant matter, it is clear that the plaintiffs borrowed various amounts of money from the defendants. The plaintiffs' testimony reveals that Mendes discouraged the plaintiffs from obtaining legal counsel. However, the plaintiffs have not presented any evidence of duress, and even if the plaintiffs did enter into each agreement under duress, they effectively ratified the contracts by failing to object in a timely manner. In addition, the plaintiffs have not demonstrated how paramount public interest requires this Court to relieve the plaintiffs from their side of the bargain after receiving the benefit of performance from the defendants for all but the $35,000 loan, which loan this Court has already deemed void.
Constructive Fraud — Unconscionability
The plaintiffs allege that Mendes took advantage of his close relationship with Cardoso for the purpose of unduly influencing the plaintiffs into signing the loan agreements, and that this amounts to constructive fraud and unconscionable conduct.
"[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or injure public interests." Castleberry v.Bransum, 721 S.W.2d 270, 273 (Tex. 1986). "Breach of fiduciary duty amounts to constructive fraud." Matarese v. Calise,111 R.I. 551, 556, 305 A.2d 112, 119 (1973). A constructive trust will be imposed upon property that is obtained in violation of a fiduciary duty. Simpson v. Dailey, 496 A.2d 126, 128 (R.I. 1985). A family relationship, of itself, does not create a fiduciary relationship, although further facts may show one. Id. Although our Supreme Court in Simpson discussed the factors to be considered in determining a confidential relationship, such analysis is inapplicable here.
Cardoso testified that he considered Mendes as an uncle and trusted everything that Mendes said and did. This Court does not find such testimony to be credible. The evidence shows that Cardoso is an astute businessman with the ability to negotiate oral agreements which he considered to be in his best interest. The fact that he may not speak, read and write English fluently does not undermine his business acument; a mere assertion, without more, that he considered Mendes as an uncle is insufficient to create a fiduciary relationship between the parties.
Furthermore, even if Cardoso could show a familial relationship between himself and Mendes, Cardoso has not made any showing of a legal or equitable duty owed to him by Mendes. Thus, Cardoso has failed to demonstrate the existence of any fiduciary relationship which, if breached, might amount to constructive fraud. In addition, the remedy, a constructive trust, was neither sought nor is appropriately imposed in the instant matter. Consequently, the allegation of constructive fraud must fail. Likewise, the claim for unconscionable conduct must also fail.
"Where mental injury is the sole complaint, recovery for direct damages may be allowed if the jurisdiction recognizes a tort for infliction of mental distress. Such an action. . .is. . .for a wrong intended to inflict emotional injuries." Vallinoto v. DiSandro, 688 A.2d 830, 839 (R.I. 1997). In order to recover on such a claim, a plaintiff must prove extreme and outrageous conduct that intentionally or recklessly caused the plaintiff severe emotional distress. In addition, the plaintiff must prove physical symptomology resulting from the alleged improper conduct. Id. at 838. "[P]sychic as well as physical injury claims must be supported by competent expert medical opinion regarding origin, existence, and causation. Id. at 839.
Here, the plaintiffs have neither alleged nor shown any evidence of physical symptomology in the form of competent expert medical opinion. As the claim for unconscionable conduct fails for want of physical symptomology, the remaining factors need not be addressed.
Payment
The plaintiffs alleged and testified that any and all payments required under the various agreements have been paid in full, such that there are no obligations outstanding and owed to the defendants. In contrast, Mendes testified the plaintiffs have not settled their debts. In addition, Mendes alleged that even assuming that the plaintiffs made all of the payments which they alleged that they made, there is, nevertheless, a deficiency balance of $300,065.89 due and owing to the defendants.
The testimony presented by both parties renders diametrically opposed accounts of payments on the loans. As there is no physical evidence of the alleged cash payments in the form of receipts or canceled checks, the issue of whether or not the plaintiffs made monthly payments in manila envelopes requires a credibility determination by this Court.
This Court finds credible the testimony of the plaintiffs that they made cash payments to Mendes. On February 22, 1993, the date of the closing on the Vasquez loan, the parties signed a H.U.D. settlement statement which declared that the $260,000 loan of 1989 had been paid down. Thus, the parties agreed that the loan was settled, and no further money was left owing. This Court will not upset a valid legal contract and finds that the $260,000 loan of 1984 was discharged in full on February 22, 1993.
According to the amortization schedules of the plaintiffs, on February 22, 1993, the plaintiffs owed $83,748.95 on the $95,000 loan. The plaintiffs testified that, in addition to the monthly cash payments of $1,393.48 which were reflected in the amortization schedule, the plaintiffs made an additional $20,000 lump sum payment towards the $95,000 loan. In addition, the plaintiffs state that they have paid the defendants a total of $14,200 towards the $35,000 loan.
In their Post Trial Memorandums to this Court, both parties creatively account for the outstanding liability of the other. The plaintiffs subtract lump sum payment from the principal, ignore the existence of the interest owed, and suggest that this Court subtract the monthly payments of $688.00 in the same manner. After the plaintiffs finish manipulating the figures, they suggest that Mendes owes $31,785 to them on the closing of the $260,000 Vasquez loan. They completely ignore the fact that the $95,000 loan has not been paid off and settled.
The defendants request this Court to accept the defendants' own records of payment to calculate the plaintiffs' debt. This Court has already found such records to be self-serving and lacking in credibility. Alternatively, the defendants state that even if the plaintiffs made all of the payments which the plaintiffs allege that they made, the plaintiffs still owe $300,065.89 to the defendants. In reaching this figure, the defendants rely exclusively on the plaintiffs' amortization schedules to calculate the plaintiffs' debt. These schedules may not be accurate in that they do not appear to reflect any of the lump sum payments made by the plaintiffs. In addition, the defendants' figure reflects the deficiency owed on the Vasquez loan guaranty, which guaranty this Court has already found to have been discharged. This Court does not find either figure suggested by the parties to be fair or accurate; however, this Court does find that after voiding the $35,000 loan, discharging the $260,000 loan of 1989 and the Vasquez loan guaranty, the only loan with an outstanding balance is the $95,000 loan of 1984.
Monetary Damages
The defendants are seeking monetary damages, alleging that the plaintiffs breached their contracts when they failed to make payments on the various loans. The only agreement to which this breach of contract claim might be applicable is the $95,000 loan in 1984. The defendants claimed that as of February 22, 1993, the plaintiffs owed $82,631.84 on said loan. This assertion ignores the plaintiffs' monthly payments of $688 made after February 22, 1993, as well as the lump sum payment of $20,000 and the payments made on the $35,000 loan.
"[A]n award of damages award must rest on legally competent evidence establishing the nature and extent thereof and may not be the result of speculation and conjecture. Although mathematical exactitude is not required, the damages must be based on reasonable and probable estimates." White v. LeClerc,444 A.2d 847, 849 (R.I. 1982)(internal citations omitted). InWhite, our Supreme Court stated that "the trial justice clearly had an obligation to examine and consider the testimony of each expert witness on the issue of damages and to accord that testimony only such weight as the evidence, considered as a whole, and the inferences drawn therefrom reasonably warranted."Id. at 849 (finding that the trial justice had the prerogative to reject testimony of the defendant's expert on the issue of damages as having "little value" and, in addition, was entitled to label the testimony of the plaintiffs expert as "grossly exaggerated" and not "wholly reliable"). "A trial justice does not err by engaging in. . .a selective evaluation and application of expert evidence to the facts presented during a trial." BlueRibbon Beef Co., Inc. v. Napolitano, 696 A.2d 1225, 1228 (R.I. 1997)(upholding the trial justice where "she cobbled together different parts of each witness's testimony with her own sense of what lost-profits methodology best appeared to fit the evidence presented to her").
In the instant matter, neither party presented expert testimony on the issue of damages. Instead, much, if not most, of the evidence before this Court concerning the amount of money paid to the defendants is in the form of oral testimony given by the parties themselves. Absent concrete evidence such as receipts, canceled checks or bank drafts, this Court must evaluate this testimony in order to determine how much money has been paid or what is owed by the plaintiffs on the $95,000 loan in 1984.
The defendants did not supply any receipts and are now trying to deny the cash payments made by the plaintiffs. "A defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. AllensManufacturing Company Inc., v. Napco. Inc., 3 F.3d 502, 505 (1st Cir. 1993)(quoting Eastman Kodak Co. v. Southern Photo Materials.Co., 272 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed 684 (1927)). This Court has already found credible the representations made by the plaintiffs concerning their monthly cash payments to Mendes and, consequently, will not permit the defendants to recover any amounts which have already been paid on this loan. In the Court's opinion, the defendants' failure to credit payments made by the plaintiffs amounts to wrongful conduct which dirtied their hands in acquiring the rights that they now assert. Nonetheless, the fact that the defendants are not permitted to recover the full amount of their request, the doctrine of unjust enrichment requires that the plaintiffs pay some amount to the defendants.
"Unjust enrichment permits the recovery in certain instances where a person has received from another a benefit, the retention of which, would be unjust under some legal principle, a situation which equity has established or recognized." Merchants MutualInsurance Company v. Newport Hospital, 108 R.I. 86, 93,272 A.2d 329, 332 (1971). "The right of recovery and the unjust enrichment doctrine has for its basis that in a given situation it is contrary to equity and good conscience for one to retain a benefit that has come to him at the expense of another and that is not necessary in order to create the obligation to make restitution or to compensate that party unjustly enriched be guilty of a tortious or fraudulent act. Id.
In the instant matter, it is clear that the plaintiffs received a loan for $95,000 in 1984. To permit the plaintiffs to avoid repaying the balance owed on this loan would result in the unjust enrichment of the plaintiffs. It is equally clear to this Court that the defendants did not credit many of the payments made by the plaintiffs and that their unclean hands in this matter should not allow them to obtain a double recovery. Given the lack of demonstrative evidence, this Court must use its equitable powers in order to ascertain the fairest and most just figure which the plaintiffs should be required to repay the defendants. This process will involve making further credibility determinations of the testimony given by the parties.
In 1984, the plaintiffs borrowed $95,000 from the defendants in order to purchase the liquor business. The monthly payment on that loan was $1,393.48. In 1993, the plaintiffs sold the business to the Vasquezes for $70,000. At that time, the plaintiffs' amortization schedule reflected that the plaintiffs owed the defendants a balance of $82,631.84. The monthly payment from the Vasquezes was $688.00. The plaintiffs agreed to pay this sum over to Mendes each month. Consequently, after handing over the Vasquez payment of $688.00 to Mendes, the plaintiffs still owed a monthly payment of $625.48. The record shows that the plaintiffs made only fifteen payments of $688.00 and made no payments on the difference. During this period, interest continued to accrue on the loan. In the meantime, the plaintiffs made monthly cash payments of $443.75 on the voided $35,000 loan for a total of $14,200.
The plaintiffs state that they made a lump sum payments of $20,000 on the $95,000 loan. Despite the fact that the plaintiffs meticulously reflected every cash payment on the amortization schedule, the plaintiffs allege that this lump sum payment is not reflected in any way on the same schedule. This Court believes that the plaintiffs did in fact make the lump sum payment, but is not convinced that the plaintiffs failed to reflect such payment, in some manner, on the amortization schedule.
After listening to testimony and reviewing the record, and in light of the complete lack of confidence that this Court has in the testimony of Alfred Mendes and the internal inconsistencies within the plaintiffs' testimony, this Court believes that the reasonable and equitable sum which the plaintiffs should pay the defendants on the $95,000 loan is $75,000. Upon payment of this judgment, the accompanying mortgages are to be released.
Counsel shall prepare the appropriate judgment for entry.
[1] This figure includes settlement charges and $5,000 deposit due.
[2] Before examining the parol evidence rule, it must be noted that whether or not the parties agreed that all payments were to be made in cash is irrelevant. There is no language in any of the promissory notes which designates or prohibits a specific method of payment. The fact that the parties agreed to cash payments does not in any way affect the terms of the contracts or the rights of the parties.
[3] Although the plaintiffs' allegation of fraud with respect to this loan does not evoke the parol evidence rule, it challenges the underlying validity of the whole transaction. The plaintiffs have alleged that Mendes represented an intention to credit their payments; however, they have not produced any evidence which proves that they were actually induced into signing the agreement as a direct result of this alleged misrepresentation. As there is no evidence that the plaintiffs were misled into making the contract, this allegation of fraud must fail and the written contract must stand.
[4] There is no obligation under the Internal Revenue Code to supply 1099 forms and the plaintiffs have not submitted evidence of any requirement on the part of the defendant to supply same. As a result, this allegation is irrelevant.